**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____
                                    :
MARIA FABIANO,                      :        CIVIL ACTION
                  Plaintiff,        :
                                    :
          v.                        :        NO. 05-0256
                                    :
JO ANNE B. BARNHART,[1]             :
COMMISSIONER OF SOCIAL SECURITY,    :
                  Defendant.        :
_____:

ARNOLD C. RAPOPORT
United States Magistrate Judge

**REPORT AND RECOMMENDATION**

          Plaintiff, Maria Fabiano ("Plaintiff"), brings this

action under 42 U.S.C. section 1383©)(3), which incorporates 42

U.S.C. section 405(g) by reference, to review the final decision

of the Commissioner of Social Security ("Defendant"), denying her

claim for disability insurance benefits ("DIB") provided under

Title II of the Social Security Act ("the Act").  42 U.S.C. §§

401-433.  Subject matter jurisdiction is based upon section

205(g) of the Act.  42 U.S.C. § 405(g).  Presently before this

Court are the parties' Cross-Motions for Summary Judgment.  For

the reasons that follow, it is recommended that the matter be

remanded for further proceedings.

I.     **PROCEDURAL HISTORY**.

          Plaintiff filed her current application for DIB on

_____

          [1]Jo Anne B. Barnhart became the Commissioner for Social
Security effective November 14, 2001.  Under FED. R. CIV. P.
25(d)(1) and 42 U.S.C. section 405(g), Jo Anne B. Barnhart is
automatically substituted as the Defendant in this action.

October 7, 1999, alleging disability following a motor vehicle accident on March 25, 1999.  Plaintiff stopped working on March 25, 1999 due to low back and headache pain.  Plaintiff alleged her disability was caused by headaches and herniated discs at L-5 and C-5.  (R. 83.)  The agency denied Plaintiff's claims initially on January 20, 2000 (R. 38-41), and she filed a timely request for a hearing before an Administrative Law Judge ("ALJ"). (R. 44-45.)

A hearing was held on July 12, 2000, before ALJ James S. Feight at which Plaintiff, who was represented by counsel, appeared and briefly testified.  (R. 312-321.)  A supplemental hearing was held on September 25, 2000, at which both Plaintiff and her daughter provided testimony along with Stanley Askin, M.D., a medical expert, and Donald Millen, M.S., a licensed psychologist and vocational expert.  (R. 322-365.)  A second supplemental hearing was held on December 27, 2000, to obtain testimony from Richard Cohen, M.D., a psychiatrist.  Plaintiff and Mr. Millen also provided additional testimony.  (R. 366-421.) On March 19, 2001, the ALJ issued a decision in which he found that Plaintiff was not disabled, that she had severe degenerative disc disease, with bulging cervical and lumbar disc; status post tear of medical meniscus of the right knee; status post tear of the lateral meniscus of the left knee; occipital neuritis; and depression.  (R. 30; Finding No. 3.)  The ALJ found that

Plaintiff could perform her past work as a financial aid officer. (R. 31; Finding No. 10.)

Plaintiff timely requested review of the ALJ's decision, but the Appeals Council declined review, therefore the ALJ's decision became the final decision of the agency.  (R. 7-10, 14-17.)  Plaintiff filed her Complaint in this Court on January 19, 2005, seeking judicial review of the Commissioner's decision.  The matter was referred to me for preparation of a Report and Recommendation on June 21, 2005.

## II.  **FACTS**.

Plaintiff was fifty-four years old when she last worked in March of 1999, making her a "younger individual" under the Commissioner's regulation.  20 C.F.R. § 416.963(b).[2]  She has a college education and past relevant work as Assistant Director of Financial Aid for the Community College of Philadelphia. (R. 84, 89.)  She reported that her job consisted of "constantly up and down," sitting, standing, etc.  (R. 84, 90.)  At the time she filed her claim, Plaintiff lived only with her husband, who is eighteen years older than Plaintiff and was receiving Social Security benefits.  (R. 82.)  By the time of the ALJ hearing, Plaintiff and her husband were forced to move in with their daughter and son-in-law and their two children, ages two and

_____

[2]Because she is considered a younger individual, Plaintiff's age is not considered a significant impediment to adapting to new work situations.  20 C.F.R. § 416.963(b).

four.  (R. 362.)

Plaintiff's complaints of debilitating pain arose out of a prior history of complaints of headaches and pain in her back and neck.  (R. 337.)  She described herself as being "in excellent physical health until approximately December of 1997, when she simply bent over to pick up a piece of paper at home and experienced lower back pain."  (R. 216.)  Plaintiff treated with an orthopedic surgeon, who suggested medication, rest, and mild physical therapy, and her pain resolved in a short period of time.  (Id.)  Plaintiff had a reoccurrence seven months later in mid-1998, and again presented to the orthopedic surgeon who suggested the same modalities.  (Id.)  Plaintiff's symptoms resolved for the most part, but came and went over the next one and one-half years.  (Id.)  On June 18, 1998, Plaintiff underwent a bone scan of her lumbar spine due to her complaints of back pain, and the results showed minimal degenerative change at L-1. (R. 115-117.)

Almost one year later, Plaintiff took short-term disability leave from her job as a financial aid officer on March 25, 1999, the date of her accident, due to low back pain and headaches.  (R. 83, 315.)  Plaintiff treated with her primary care physician, Dr. Gilbert Kasirsky, and orthopedic surgeon, Martin A. Cohen, M.D.  (R. 85, 115-116, 125.)  On March 28, 1999, at the request of Dr. Cohen, Plaintiff underwent an MRI of her

4

lumbar spine.  The radiologist noted a history of low back pain and right leg buckling.  (R. 125.)  The MRI revealed mild disc degeneration at L4-5 but no disc bulge, protrusion, or herniation, and the foramina and central canal were normal.  (R. 125.)  At L5-S1, the MRI revealed disc degeneration and a right paramedian disc protrusion having mild mass effect on the right anterior thecal sac without evidence of nerve compression.  (Id.)  Plaintiff had a transitional vertebra referred to as S-1.  (Id.)

Despite this finding of disc degeneration and right paramedian disc protrusion at L5-S1, Dr. Cohen indicated in treatment notes dated April 1, 1999, that Plaintiff's straight leg raising ("SLR")[3] was negative and his review of the MRI scan revealed "posterior and right sided herniation of the disc at L-5-S-1."[4]  (R. 134.)  As a result, Dr. Cohen medically excused Plaintiff from work for four weeks so that she could undergo a treatment program of Naprosyn, back exercises, hot packs, and ultrasound.  (R. 132-134.)  Over the next month, Plaintiff's SLR alternated between negative and positive.  (R. 131-133.)  Formal

---

[3]The SLR test is designed to detect nerve root pressure, tension, or irritation of the sciatic nerve.  With the knee fully extended, the physician raises the involved leg from the examining table.  A positive SLR is the single most important sign of nerve root pressure produced by disc herniation.

[4]Dr. Cohen also stated in a letter dated October 5, 2000, that Plaintiff's diagnosis included a herniated disc in her lumbar spine (R. 291), and in a letter dated January 15, 2001, that Plaintiff's MRI revealed herniation at L5-S1 and an angular tear of the L4-5 disc.  (R. 300.)

physical therapy was discontinued on April 29, 1999.  (R. 132.)
Plaintiff reported on May 13, 1999 that she was doing the back
exercises on her own and improvement in her pain level without
any analgesics in the prior week.  Her straight leg-raising test
was positive on the right.  (R. 131.)

Plaintiff planned to return to work on June 1, 1999,
but was again involved in a motor vehicle accident on May 27,
1999.  Plaintiff returned to Dr. Cohen with reports that she
injured her neck, experienced increased headaches, and an
exacerbation of her low back pain.  An x-ray of Plaintiff's
cervical spine was normal.  (R. 123.)  Dr. Cohen diagnosed acute
lumbosacral strain and exacerbation of his prior diagnosis of
herniated disc at L5-S1.  (R. 130.)  Dr. Cohen prescribed
continuing physical therapy but prescribed no medication because
he noted that Plaintiff was still taking medication for her
headaches.  (Id.)

On June 4, 1999, Plaintiff saw Vincent Ferrara, M.D., a
neurosurgeon, for a consultation regarding her headaches.  (R.
203.)  Dr. Ferrara noted that Plaintiff had been out of work for
nine weeks due to a herniated disc in her back.  (Id.)  Plaintiff
related that she had awakened on May 13, 1999 with a headache,
and the accident on May 27, 1999 increased her head pain.  (Id.)
Dr. Ferrara noted that the June 1, 1999 MRI of Plaintiffs' brain
showed a large defect in the corpus collosum which diagnostically

could be attributed to a developmental anomaly, a prior infarct, or old trauma.  The remainder of the study was normal.  (R. 164, 204.)  Dr. Ferrara thought Plaintiff was having vascular headaches, and despite the negative MRI, ordered a magnetic resonance angiography ("MRA") of her head.  (R. 204.)  An MRA on June 10, 1999 revealed atheromatous disease along the wall of the right internal carotid artery just distal to its origin which produced a stenosis, severe narrowing of the supraclinoid internal carotid artery, and possible narrowing of the right middle carotid artery ("MCA") bifurcation.  (R. 121-122, 161-162.)  Dr. Ferrara prescribed a three to four day treatment of Midrin.[5]  (R. 204.)  There is no indication that Plaintiff returned for follow-up.

On June 17, 1999, she reported that she had a neurological consultation on June 4 with Dr. Ferrara and was taking migraine medication and Vicodan for pain control.  (R. 129, 203.)  Plaintiff returned to Dr. Cohen reporting that her back felt better due to her migraine medication.  (R. 129.)  Although Dr. Cohen noted improving lumbar radiculopathy, there was no objective evidence of nerve compromise.  In addition, Dr. Cohen found no focal deficits neurologically in Plaintiff's lower extremities.  (Id.)

Following several months of physical therapy at The

_____

[5]Midrin is an antimigraine medication.

Achievement Center and with Dr. Kasirsky, Plaintiff continued to complain of severe neck pain with radiation down her right arm, continuing severe headache pain, and low back pain with radiation down her right leg.  Treatment notes indicated that she exhibited decreased range of motion in her cervical and lumbar spines, positive straight leg raising tests, decreased strength bilaterally in her upper and lower extremities, and headaches. (R. 135-160, 165-202.)

A July 9, 1999 cervical spine MRI revealed a small spondylitic disc bulge with endplate remodeling at C5-6, but no central or neural foraminal stenosis.  There was no disc herniation, central stenosis, or nerve root impingement.  (R. 119-120.)

In August 1999, Dr. Kasirsky referred Plaintiff to neurologist Randy M. Rosenberg, M.D., regarding the source for her headaches.  (R. 211-213.)  A September 1, 1999 MRA revealed no gross abnormality, and the radiologist who performed the study concluded that the examination was insufficient to exclude aneurysm, and recommended further studies.  (R. 118.)  In an October 11, 1999 letter, Dr. Rosenberg noted that although the radiologist thought that the study was suboptimal for exclusion of aneurysm, he thought the quality of the study was quite good, and found nothing to suggest occlusive disease or any other anomaly of intracranial circulation.  (R. 208.)  Upon

8

examination, Dr. Rosenberg noted no acute distress, mental status within normal limits, sensory functioning intact, normal gait for heel-walking, toe walking, and tandem gait, full deep tendon reflexes.  (R. 212.)  Other than pain duplicated by palpation over the greater occipital nerve, Plaintiff's examination was unremarkable, and described her headaches as unusual and specifically noted that Plaintiff had no personal risk factors for disease.  (<u>Id.</u>)  Dr. Rosenberg indicated that Plaintiff was experiencing occipital neuralgia[6] and discussed with Plaintiff the possibility of a nerve block which he believed would be a reasonable diagnostic therapeutic endeavor.  (R. 241.)  Plaintiff admitted an aversion to any invasive study and postponed any such nerve block strategy.  (<u>Id.</u>)

On October 4, 1999, Plaintiff's primary physician, Dr. Kasirsky, completed an Attending Physician Statement for the insurance company in which he indicated that Plaintiff had seen Dr. Martin Cohen, an orthopedic doctor, and Drs. Ferrera and Rosenberg, two neurologists, and her diagnosis was disc bulge at C5-6 and headaches.  (R. 214-215.)  Dr. Kasirsky assessed her functional abilities as able to sit 15 minutes, walk 15 minutes, stand 5 minutes, and bend 2 minutes, and that she was not able to

---

[6]Occipital Neuralgia - paroxysmal (a sudden recurrence or intensification of symptoms) pain which extends along the course of one or more nerves pertaining to the back part of the head. <u>Dorland's Illustrated Medical Dictionary</u>, 27th ed., pp. 1126, 1164, 1233.

climb, crawl, squat, lift, twist, or kneel.  (Id.)  He also
indicated that Plaintiff should avoid pushing/pulling, fine
manipulation, heights, operating machinery, reaching/working
above shoulder height, and was limited to operating a motor
vehicle less than two hours per day.  (Id.)

Dr. Kasirsky completed an undated[7] Physical Residual
Functional Capacity form indicating that Plaintiff could stay on
her feet less than one hour at a time, could stand and walk a
total of two hours in an eight hour workday, could sit less than
one hour at a time and sit a total of two hours in an eight hour
workday.  (R. 289-290.)  Plaintiff could alternatively sit and
stand a total of three hours without having to lie down, and
would have to lie down three hours out of eight in a workday.
(R. 289.)  Dr. Kasirsky also opined that Plaintiff could rarely
(approximately four times a day) lift two to three pounds.  (Id.)
He indicated that Plaintiff could not use her right hand for fine
manipulation and could use neither her hands nor her feet to push
or pull hand or foot controls, nor could she ever bend, squat or
crawl, and could only occasionally climb stairs and reach.  (Id.)
Dr. Kasirsky indicated that Plaintiff had severe limitations
against unprotected heights, being around moving machinery,
exposure to the stress of a competitive setting on a full-time

---

[7]Although the form is not dated, information at the top and
bottom indicates that the form was faxed sometime in 2000.

basis and against driving automotive equipment, and she was moderately limited against exposure to marked changes in temperature and humidity, dust and fumes.  (Id.)  Plaintiff was advised to elevate one or both of her lower extremities whenever she needed for comfort, and her stamina and endurance would interfere with her daily activities in a work environment.  (R. 290.)  Finally, the doctor indicated that he believed Plaintiff's complaints of pain and that objective medical evidence demonstrated a condition which could reasonably be expected to give rise to the degree of pain of which she complained, specifically a cervical disc bulge.  (Id.)

On November 8, 1999, Plaintiff's Progress Report from The Achievement Center indicated that she had achieved maximum benefit from physical therapy.  (R. 136.)  Plaintiff was sent to a DDS examination by Scott L. Cohen, M.D., on December 1, 1999. (R. 216-223.)  Dr. Cohen noted that Plaintiff had trouble ambulating, getting on the examination table, and sitting on the examination table for long periods, and Plaintiff had to get up from the table and continue conversation in a standing position. (R. 217.)  Upon physical examination, he noted that she had brisk lower extremity reflexes at 3/4, decreased range of motion in her cervical spine, with considerable tenderness to light touch in her posterior cervical areas.  On abduction of her arms, Plaintiff was limited to approximately 45 degrees and had

considerable pain in her superior trapezius areas and her muscle
strength was decreased to 4/5 bilaterally in her grip.  Plaintiff
had decreased flexion and extension of her lumbar spine with a
positive SLR test bilaterally, and significant paravertebral[8]
muscle spasm in her lumbar spine.  She was unable to squat or
straight leg bend.  Plaintiff appeared mildly depressed secondary
to her pain.

Dr. Cohen's impression was that Plaintiff had cervical
disc disease with radiculopathy and range of motion impairment,
lumbar disc disease with range of motion impairment and
limitation of functioning, and impairment in the ability to work
in her occupation due to her inability to drive and perform
activities consistent with an administrator.  In a Medical Source
Statement, Dr. Cohen limited Plaintiff to lifting and carrying
two to three pounds frequently, ten pounds occasionally, and
never anything heavier than ten pounds.  (R. 220-223.)  He also
opined that she was limited to standing and walking one hour or
less in an eight hour day, sitting one hour, could not push or
pull with either her upper or lower extremities due to cervical
and lumbar radiculopathies, and that she could not bend, kneel,
stoop, crouch, balance, or climb.  (Id.)

In February 2000, Dr. Martin Cohen noted an area of

---

[8]Paravertebral - beside the vertebral column.  Dorland's, p.
1231.

12

hypesthesia over the dorsum of Plaintiff's right hand in the C-6, 6-7 distribution.  (R. 257.)  Grip strength was fair to good and there was no intrinsic muscle weakness.  Dr. Cohen provided Plaintiff with a prescription for an aquatic exercise conditioning program.  (Id.)  In April 2000, Dr. Cohen noted that Plaintiff continued to experience sensory changes in the right hand, with mixed sensations of hot and cold in the tips of her fingers.  (R. 255.)

In June 2000, Plaintiff saw physiatrist[9] Frederick R. Struthers for right ear, neck and lower back pain and pounding in her head.  Plaintiff reported that prior to her accident, she walked three miles per day.  Upon examination, Dr. Struthers found that sensation was impaired in the right C5 region, decreased range of motion of the cervical spine and very poor back support muscles.  (R. 245-248.)  Plaintiff also had positive SLR tests bilaterally and spasms in her cervical, thoracic and lumbar spine.  He noted that Plaintiff was extremely sensitive, and when she moved too fast she became dizzy.  Plaintiff reported depression.  Dr. Struthers recommended that Plaintiff should wear a back brace or binder and begin a walking program.  Plaintiff reported that the binder helped dramatically and took away her

_____

[9]Physiatrist - a physician who specializes in a branch of medicine which deals with the diagnosis, treatment, and prevention of disease with the aid of physical agents, such as light, heat, cold, water, and electricity, or with mechanical apparatus; physical medicine.  Dorland's at 1291.

13

pain.

Plaintiff began a walking program and in June of 2000, her right knee buckled and she fell, injuring her knees and right elbow.  (R. 254.)  X-ray of Plaintiff's right elbow showed a step off in the radial neck suggestive of a healing radial head fracture.  (R. 253.)  MRI of Plaintiff's right knee on October 21, 2000 revealed a tear of the posterior horn of the medial meniscus, with a possible tear of the anterior horn of the lateral meniscus, which was small in size and was also possibly torn.  (R. 293.)  Plaintiff also had a large area of bone bruising in the medial femoral condyle, moderate joint effusion, and stage III chondromalacia patella.[10]  (Id.)  MRI of the left knee taken on October 23, 2000 showed moderate sized joint effusion, degenerative changes in the posterior horn and body of the lateral meniscus, and tear of the anterior horn of the lateral meniscus.  (R. 292.)

Treatment notes from physical therapy and Dr. Martin Cohen's notes also document Plaintiff's complaints with sleeping and drowsiness as a side effect of medication.  At various times following her last day of work, Plaintiff was on medications including Neurontin, Serzone, Oxycontin, Zoloft, Elavil, and

---

[10]Chondromalacia patella - a premature degeneration of the patellar cartilage, the patellar margins being tender so that pain is produced when the patella is pressed against the femur. Dorland's at 326.

Ritalin.  (R. 276-288.)

Evidence in the record reveals treatment received by Plaintiff for depression.  Plaintiff began treatment with Javad Mohsenian, M.D., a psychiatrist, following suicidal ideations. On July 18, 2000, Dr. Mohsenian completed a Mental Impairment Questionnaire in which he diagnosed Plaintiff with major depression with a GAF of 50.  (R. 258-261.)  Dr. Mohsenian indicated clinical findings of irritability, depressed affect, feelings of guilt and worthlessness, suicidality, tiredness, and decreased energy.  Plaintiff was taking Zoloft and Serzone for depression and responded poorly to psychotherapy and pharmacotherapy.  Dr. Mohsenian indicated that her prognosis was poor, and that she had a compulsive and perfectionist nature that made it very difficult for her to accept her difficulties, and stated that he anticipated that Plaintiff's impairments would cause her to be absent from work more than three times per month. Additionally, he indicated that Plaintiff was extremely depressed with much pain, and assessed her as markedly limited in her activities of daily living and maintaining social functioning, that she frequently experienced deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner, and that she experienced continual episodes of deterioration or decompensation in work or work-like settings which caused her to withdraw from that situation or to experience

15

exacerbation of signs and symptoms.  (Id.)

Dr. Mohsenian completed a Mental Residual Functional Capacity Assessment on September 20, 2000.  (R. 267-268.)  He indicated that Plaintiff would not respond well to work-related stressors and that even a routine, repetitive, simple entry-level job would actually serve as a stressor which would exacerbate her psychological symptoms.  (Id.)  He also indicated on this check-box form that Plaintiff was substantially impaired in her ability to (1) maintain attention and concentrate for at least two straight hours, four times per day; (2) sustain an ordinary routine without special supervision; (3) work in coordination with or proximity to others without being distracted; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rests; (5) interact appropriately with the general public or customers; (6) accept instructions and respond appropriately to criticism from supervisors; (7) maintain socially appropriate behavior and to adhere in basic standards of neatness and cleanliness; (8) respond appropriately to unexpected changes in the work setting; (9) be aware of normal hazards and take necessary precautions; and (10) travel in unfamiliar settings and use public transportation.  (Id.)

Dr. Cohen authored an October 5, 2000 letter stating

16

that Plaintiff's diagnoses included a herniated disc in her

lumbar spine.  (R. 291.)  Again, on January 15, 2001, Dr. Cohen

stated that "her most recent MRI scan of the lumbar spine

demonstrates herniation of the L5-S1 disc and angular tear of the

disc at L4-5.  The treatment plan involves continue use of the

medication, and epidural steroid injection.  Since the MRI scan

demonstrates the patient spinal problem that confirms the

diagnosis, EMG and NCV tests are not necessary at this time."[11]

(R. 300.)

This Court has independently and thoroughly examined

the entire record.  We incorporate all additional, relevant facts

in our discussion below.

III.      **STANDARD OF REVIEW**.

The role of this Court on judicial review is to

determine whether there is substantial evidence in the

administrative record to support the Commissioner's final

---

[11]EMG and NCS stand for electromyography and nerve
conduction study, and are the recording and study of the
intrinsic electrical properties of skeletal muscle (1) by means
of surface or needle electrodes to determine merely whether the
muscle is contracting or not (useful in kinesiology); or (2) by
insertion of a needle electrode into the muscle and observing by
cathode-ray oscilloscope and loud-speaker the action potentials
spontaneously present in a muscle (abnormal) or induced by
voluntary contractions, as a means of detecting the nature and
location of motor unit lesions; or (3) by recording the
electrical activity evoked in a muscle by electrical stimulation
of its nerve, a procedure useful for study of several aspects of
neuromuscular function, neuromuscular conduction, extent of nerve
lesion, reflex responses, etc.  Dorland's at 537.

decision.  Any findings of fact made by the Commissioner must be
accepted as conclusive, provided that they are supported by
substantial evidence.  42 U.S.C. § 405(g).  "Substantial
evidence" is deemed to be such relevant evidence as a reasonable
mind might accept as adequate to support a decision.  42 U.S.C. §
405(g); Richardson v. Perales, 402 U.S. 389, 407 (1971)(quoting
Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see
also Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992),
cert. denied, 113 S.Ct. 1294 (1993).  When determining whether
the ALJ's decision is supported by substantial evidence, the
court may look to any evidence in the record, regardless of
whether the ALJ cites to it in his decision.  Hook v. Bowen, 677
F. Supp. 305, 306 (M.D. Pa. 1988); Esposito v. Apfel, 2000 WL
218119, at *6 (E.D. Pa. Feb. 24, 2000).  Thus, the issue before
this Court is whether the Commissioner's final decision of "not
disabled" should be sustained as being supported by substantial
evidence.  Moreover, apart from the substantial evidence inquiry,
a reviewing court must also ensure that the ALJ applied the
proper legal standards in evaluating a claim of disability.
Coria v. Heckler, 750 F.2d 245 (3d Cir. 1984).

        To prove disability, a claimant must demonstrate that
there is some "medically determinable basis for an impairment
that prevents him from engaging in any 'substantial gainful
activity' for a statutory twelve-month period."  42 U.S.C. §

423(d)(1).  Each case is evaluated by the Commissioner according

to a five-step process:

> The sequence is essentially as follows:  (1)
> if the claimant is currently engaged in
> substantial gainful employment, []he will be
> found not disabled; (2) if the claimant does
> not suffer from a "severe impairment," []he
> will be found not disabled; (3) if a severe
> impairment meets or equals a listed
> impairment in 20 C.F.R. Part 404, Subpart P,
> Appendix 1 and has lasted or is expected to
> last continually for at least twelve months,
> then the claimant will be found disabled; (4)
> if the severe impairment does not meet prong
> (3), the Commissioner considers the
> claimant's residual functional capacity
> ("RFC") to determine whether []he can perform
> work []he has done in the past despite the
> severe impairment - if []he can, []he will be
> found not disabled; and (5) if the claimant
> cannot perform [his] past work, the
> Commissioner will consider the claimant's
> RFC, age, education, and past work experience
> to determine whether []he can perform other
> work which exists in the national economy.
> *See id*. § 404.1520(b)-(f).

Schaudeck v. Comm'r of Social Sec. Admin., 181 F.3d 429, 431-32

(3d Cir. 1999).

**IV.      ALJ DECISION AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT.**

         Plaintiff's alleged disability involves an inability to

work due to back and head pain, depression, and bilateral knee

problems.  The ALJ found that Plaintiff cannot return to her past

relevant work either because of the exertional requirements or

because the manipulative demands of the job exceed the ALJ's

limits on Plaintiff's ability to perform manipulative functions.

(R. 23.)  The ALJ proceeded through the sequential evaluation

process and found Plaintiff was not disabled due to her impairments.[12]  (R. 15-24.)

In her Motion for Summary Judgment, Plaintiff asserts that: (1) the ALJ failed to properly evaluate her residual functional capacity and non-exertional impairments; (2) the hypothetical to the VE was flawed; (3) the ALJ failed to discuss and accord weight to relevant reports submitted by Plaintiff's treating physicians; (4) the ALJ failed to discuss the reasons why Plaintiff did not meet or equal Listing 1.05, Disorder of the Spine; (5) the ALJ erred in his credibility determination, particularly with respect to pain and physical and mental limitations; and (6) the ALJ's finding that Plaintiff can return to her past relevant work is not based on substantial evidence. The sole issue before this Court, however, is whether the Commissioner's final decision of "not disabled" should be sustained as being supported by substantial evidence.  With regard to our review of Plaintiff's claims, the various sources

---

[12]The ALJ proceeded through the first four steps, finding that: 1. Plaintiff has not been engaged in substantial gainful activity since her alleged onset date; 2. Plaintiff has an impairment or combination of impairments considered severe; 3. Plaintiff's impairments or combination of impairments do not meet or equal the criteria of a listed impairment in Appendix 1, Subpart P, Regulations No. 4; and 4. Plaintiff is able to perform her past relevant work.  (R. 30-31.)  The ALJ found that Plaintiff has the residual functional capacity to perform semi-skilled, sedentary work which involves lifting up to ten pounds, occasional standing/walking, and frequent sitting, and which would allow for alternating between sitting and standing.  (R. 31.)

of medical evidence, the submissions of counsel, and the testimony at the ALJ hearing were consulted.

Based on this Court's independent and thorough review of the record and for the reasons that follow, we find that the ALJ's decision fails to address certain fundamental pieces of evidence.  Thus, the ALJ's decision cannot be said to be supported by substantial evidence.  We will, therefore, recommend that the matter be remanded.

**V.      DISCUSSION.**

Plaintiff alleges that the ALJ's decision is not supported by substantial evidence, in part because it lacks consideration of relevant evidence and is defective in its credibility determination.[13]  (Pl.'s Br., pp. 11-23; Pl.'s Reply Br., pp. 1-6.)  Defendant argues that the ALJ followed the five step sequential evaluation process and that there is substantial evidence in support of the ALJ's decision.  (Def.'s Br. at 15-22.)  Though Defendant correctly states that the ALJ followed the five step sequential evaluation process, we find that the ALJ's decision lacks consideration of relevant evidence.

In reaching a decision, the ALJ must consider all of the relevant evidence in the record.  Wier v. Heckler, 734 F.2d 955, 963 (3d Cir. 1984); Cotter v. Harris, 642 F. 2d 700, 705 (3d

---

[13]Plaintiff also alleges that an inadequate hypothetical to the VE renders the ALJ's decision unsupported by substantial evidence.  (Pl.'s Br. at 22-23; Pl.'s Reply Br. at 4-5.)

Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979); Gober v. Mathews, 574 F.2d 772, 776 (3d Cir. 1978). Furthermore, to guard against an abuse of discretion by the Commissioner, the ALJ is required to provide some indication of the evidence which was rejected in arriving at the decision and the reasons therefore, so that a reviewing court can determine whether probative evidence was properly credited or simply ignored.  See Cotter, at 705.

Plaintiff argues that the ALJ failed to consider relevant reports from Plaintiff's treating physicians, Dr. Martin Cohen[14] and Dr. Gilbert Kasirsky, both of whom treated Plaintiff for over two years, saw her frequently, and were consistent in their assessment of her limitations and the cause thereof. Treating physician reports are to be given special significance. Morales v. Apfel, 225 F.3d 310 (3d Cir. 2000).  The Morales court stated, "[a] cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on continuing observation of the patient's

---

[14]This Court notes that Plaintiff was treated Dr. Martin Cohen, an orthopedist, she was evaluated by Dr. Scott Cohen, a consultative examiner, and Dr. Richard Cohen, a psychiatric medical expert, testified at the ALJ hearing.  The ALJ states that he considered the opinion of Dr. Scott Cohen, but then goes on to distinguish, in the same paragraph, the clinical findings of Dr. Martin Cohen, without mentioning Dr. Martin Cohen's name. Additionally, there is no further discussion of Dr. Scott Cohen's evaluation.  (R. 29.)

condition over a period of time.'"   Id. at 317(quoting Plummer v.
Apfel, 186 F.3d 422, 429 (3d Cir. 1999)(quoting Rocco v. Heckler,
826 F.2d 1348, 1350 (3d Cir. 1987))).   In addition, "a treating
physician's report not only may be given more weight, it must be
given controlling weight."   20 C.F.R. § 404.1527.

The ALJ noted some of the treatment administered by
Plaintiff's treating physician, Dr. Martin Cohen; however, the
ALJ failed to acknowledge or discuss other highly relevant
reports submitted by Dr. Martin Cohen.   In discussing the records
submitted by Dr. Martin Cohen, the ALJ stated:

> Notes from Dr. Martin Cohen document the
> claimant's complaints of back pain, radiating
> to her legs.   The claimant reported that her
> symptoms were aggravated by driving and
> prolonged sitting.   The claimant also
> complained of difficulty sleeping, secondary
> to pain.   Clinical findings included
> decreased range of motion, tenderness of the
> PSIS, intermittent positive straight leg
> raise and/or Patrick's test, and decreased
> sensation over the dorsum of the hand.   No
> other consistent clinical abnormalities were
> documented.   These records also indicate the
> claimant complained of severe headaches/
> migraines.   His impressions included acute
> cervical sprain, bulging cervical disc, and
> herniated lumbar disc (Exhibits 3F and 20F).
> In a letter dated October 5, 2000, Dr. Cohen
> reported that the claimant's orthopedic
> diagnoses were degenerative cervical disc
> disease with cervical disc bulging at C5-6;
> herniated lumbar disc; degenerative arthritis
> of the right knee; and status post fracture
> of radial head right elbow.   He noted
> physical examination had shown tenderness and
> restriction of motion in both the neck and
> back, and that MRI scans had been positive
> (Exhibit 28F).

. . . .

At the September 25, 2000, hearing, Dr. Stanley Askin, an orthopedic medical expert, testified that the laboratory studies only show disc bulging, with no evidence of nerve root involvement.  He also noted that there was no EMG showing radiculopathy.  Although, some doctors speak of an "impression" of radiculopathy there is no objective evidence of record to confirm the same.  Dr. Askin testified that this case appears to be one of symptom magnification, as there is no objectively established condition that would be reasonably likely to cause the pain and restrictions alleged.  It is noted that there is a law-suit arising out of the motor vehicle accident.

. . . .

The Administrative Law Judge finds the testimony of the claimant to be not fully credible.  The claimant's statements concerning her impairments and their impact upon her ability to work are not accepted by the Administrative Law Judge to the extent whose statements allege a level of disabling symptoms which exceed what the objective evidence and clinical findings could reasonably be expected to produce. Specifically, the Administrative Law Judge emphasizes that objective testing (i.e. x-rays, MRI, and bone scan) showed only minimal degenerative changes and disc bulging/protrusion at L5-S1 and C5-6.  There is no evidence of any neural foraminal encroachment or nerve root involvement. Moreover, there is no EMG/NCV study to confirm complaints of radiculopathy. Additionally, while the claimant apparently experiences some neck/back tenderness and restriction motion, physical examination has failed to reveal consistent clinical findings, i.e. decreased sensation, reflexes, or strength or muscle atrophy, which would support the claimant's allegations of severe pain and limitation.

24

> The Administrative Law Judge has also
> considered the opinions of Dr. Gilbert
> Kasirsky, Dr. Frederick Struthers and Dr.
> Scott Cohen, but finds that, consistent with
> the testimony of the medical experts, their
> impressions/diagnoses and conclusions are not
> supported by the objective evidence of
> record.  Specifically, while Dr. Struthers
> indicates that his impression is that the
> claimant suffers from radiculopathy at C5, he
> does not refer to any laboratory study or
> clinical evidence to support this impression.
> He also speaks of an impression of lumbar
> radiculopathy and herniated disc, but again
> does not reference any objective study to
> support his impression.  Likewise, Dr. Cohen
> speaks of cervical radiculopathy and lumbar
> herniation, but does not point to any
> objective laboratory studies to support such
> a diagnosis.  As for Dr. Kasirsky, he
> completed three functional capacity
> evaluations, each with slightly different
> abilities.  He attributes his extremely
> limited assessments merely to a cervical disc
> bulge and headaches.  Finally, the
> Administrative Law Judge has considered the
> opinion of Dr. Javad Mohsenian and finds his
> June 2000 assessment is not an accurate
> reflection of the claimant's ongoing mental
> status.  Rather, he finds that the September
> 2000 assessment, which indicates improved
> functioning with therapy and medication to be
> more probative.

(R. 26, 28, 29.)  This review of the treating physician's reports

fails to discuss Dr. Martin Cohen's opinion in January 15, 2001

correspondence that an MRI scan showed a herniation at L5/S1 and

an annular tear at L4/5, as opposed to a "bulge" that was

reported by the radiologist.  (R. 300.)  Dr. Cohen echoed his

first diagnosis with an October 5, 2000 letter stating that

objective findings supported Plaintiff's subjective complaints.

(R. 291.)  The medical advisor, Dr. Stanley Askin, did not review the MRI films, rather he based his opinion on the reports in the record.  Dr. Askin noted that Dr. Cohen's diagnosis was different from the radiologist who viewed the MRI films.[15]

_____

[15]At the hearing, upon cross-examination of Dr. Askin, the following exchange took place:

> ALJ:  Well what's the condition, what is that condition here?
> ATTY: I think she doesn't have normal readings.
> ALJ: Well that's that, of bulge and the protruding?
> ATTY: Bulge and I think Judge, you know, that there's certain doctors would say a bulge is a disk, is a herniated disk, just as in fact, her treating orthopedist, calls his interpretation of the MRI reading a herniation.  He disagrees with what's –
> ALJ: Does he actually say that, I think it said impression --
> ATTY: Well there was an indication from Dr. Cohen, at least on one place called it a disk herniation.
> ALJ: I thought he said impression of.
> ATTY: Not to quibble, I understand he just mentioned disk herniation as part of his diagnostic, you know, the September – excuse me, July 15, 1999, I don't have the exhibit number.  But it says herniated lumbar disk under his impression.
> ALJ: Usually the diagnosis would be, you don't [INAUDIBLE].  If you write that impression, you meaning for an impression primarily coming from the symptomatology, or the impression coming – wouldn't you just say what the MRI, or what the EMG, or what the x-ray showed, why would you write impression?
> ATTY: Well some doctors more or less, subsume the diagnostic reading of the MRI into their diagnosis, but I can't interpret that for Dr. Cohen.  Okay.  In the medical profession, how does the word impression done normally?

The ALJ also never discussed the fact that Dr. Scott Cohen completed a Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities.  (R. 216-223.) Because the opinions recorded in the Medical Source Statement by Dr. Scott Cohen are consistent with an inability to perform substantial gainful activity, the ALJ should have specifically addressed this evidence.

As noted *supra*, this Court "cannot conduct de novo review of the Commissioner's decision or re-weigh the evidence of record." Schwartz v. Halter, 134 F.Supp. 2d 640, 647 (E.D. Pa. 2001)(citing Palmer v. Apfel, 995 F.Supp. 549, 552 (E.D. Pa. 1998)).  Thus, where the ALJ has failed to adequately explain in the record his reasons for rejecting or discrediting competent evidence,[16] "the reviewing court cannot tell if significant

---

ME:   Yes, it's the diagnosis.
ATTY: That's the diagnosis?
ME: Yeah.
ALJ: Okay.  Then why doesn't he say diagnosis?
ATTY: That's doctors has different styles.

. . . .

ALJ: Well if we're going to have a reconvened hearing with a psychiatrist, you may want to ask Dr. Cohen where he finds the herniation in this record?
ATTY: Okay.

(R. 334-335, 336.)

[16]Competent evidence includes the opinion of a treating physician as to the nature and severity of the claimant's

probative evidence was not credited or simply ignored."
Schwartz, 134 F.Supp. at 648 (citing Cotter, 642 F.Supp. at 705).
The Third Circuit has directed that "[w]here competent evidence
supports a claimant's claims, the ALJ must explicitly weigh the
evidence," Dobrowolsky, 606 F.2d at 407, see also Sykes v. Apfel,
228 F.3d 259, 266 (3d Cir. 2000), and explain a rejection of the
evidence.  See Schaudeck, 181 F.3d at 435 (citing Benton v.
Bowen, 820 F.2d 85, 88 (3d Cir. 1987)).

> Unless the Secretary has analyzed all
> evidence and has sufficiently explained the
> weight he has given to obviously probative
> exhibits, to say that his decision is
> supported by substantial evidence approaches
> an abdication of the court's "duty to
> scrutinize the record as a whole to determine
> whether the conclusions reached are
> rational."

Id.  Meaningful judicial review of the ALJ's decision is not
possible where the ALJ has not sufficiently explained the weight
given to all probative evidence, which necessarily includes the
treating physician's assessment of claimant's abilities and
limitations.  See 20 C.F.R. §§ 404.1527(e), (a)(2).  This Court
may not presume to know why the ALJ rejected relevant portions of
the opinions of Drs. Martin Cohen and Kasirsky; judicial review
is not meaningful when based on such presumptions.  Woodcock v.
Barnhart, 2003 WL 1949638, at *6 (E.D. Pa. Apr. 24, 2003).
Therefore, the matter should be remanded to allow the ALJ an

---

impairments.  See 20 C.F.R. § 404.1527(a)(2).

opportunity to specifically weigh the evidence and explain any rejection of competent evidence.

## VI.    **CONCLUSION**.

Remand is necessary for the ALJ to review the entire record, including all relevant evidence submitted by Plaintiff's treating physicians.  If the ALJ should determine that Plaintiff does not qualify for disability for his impairment or combination of impairments, the ALJ must articulate the weight applied to the evidence and the reasons for rejecting Plaintiff's claim of disability.[17]  In light of this re-evaluation of the evidence, the ALJ should also reconsider both his credibility determination and the hypothetical proposed to the VE.[18]  Finally, Plaintiff should remain cognizant that the ultimate burden of proving disability rests with her.

Therefore, I make the following:

---

[17]  The Third Circuit requires the ALJ to set forth the reasons for his decision.  Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000)(citing Cotter, 642 F.2d at 704-05).

[18]  The Third Circuit has consistently held that because the VE provides opinion as to the claimant's residual functional capacity, the hypotheticals posed to a VE must accurately identify "all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987)(citing Podedworny v. Harris, 745 F.2d 210 (3d Cir. 1984) and Wallace v. Sec'y, 722 F.2d 1150, 1155 (3d Cir. 1983)(stating the expert must have evaluated claimant's particular impairments as contained in the record)).

## RECOMMENDATION

AND NOW, this          day of November, 2005, it is RESPECTFULLY RECOMMENDED that the Plaintiff's Motion for Summary Judgment should be GRANTED in part, the Defendant's Motion for Summary Judgment should be DENIED, and the matter should be REMANDED.

BY THE COURT:

_____

ARNOLD C. RAPOPORT,
United States Magistrate Judge

30